# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

CHRISTOPHER K. WILSON
        Plaintiff,

     v.                                    Case No. 20-C-732

KILOLO KIJAKAZI,[1]
Acting Commissioner of the Social Security Administration
                Defendant.

## DECISION AND ORDER

In social security disability cases, it is blackletter law than an Administrative Law Judge ("ALJ") may not "cherry pick" from the record, reciting only the evidence supportive of his decision while ignoring significant contrary evidence. See, e.g., Engstrand v. Colvin, 788 F.3d 655, 662 (7th Cir. 2015). The ALJ is also required to build an accurate and logical bridge from the evidence to his conclusions. See, e.g., Spicher v. Berryhill, 898 F.3d 754, 757 (7th Cir. 2018).

But a corollary to these rules is the requirement that on judicial review the ALJ's decision be read as a whole and with common sense. See, e.g., Curvin v. Colvin, 778 F.3d 645, 650 (7th Cir. 2015). The court will not reverse an ALJ's decision simply because he uses boilerplate language in one part of the decision, so long as he goes on to specifically explain the bases for his conclusions. See, e.g., Schomas v. Colvin, 732 F.3d 702, 708 (7th Cir. 2013). Nor is the ALJ required to neatly package his analysis of an issue within a single section or paragraph of his decision. See, e.g., Buckhanon ex rel.

---

[1] Pursuant to Fed. R. Civ. P. 25(d), Kilolo Kijakazi is substituted for Andrew Saul as the defendant.

1

J.H. v. Astrue, 368 Fed. Appx. 674 (7th Cir. 2010 (citing Rice v. Barnhart, 384 F.3d 363, 369 (7th Cir. 2004); Shramek v. Apfel, 226 F.3d 809, 811 (7th Cir. 2000)).

In the present case, plaintiff Christopher Wilson seeks judicial review of the denial of his application for social security disability benefits.  Plaintiff alleged that he could no longer work due to back, knee, shoulder, and mental impairments, but the ALJ assigned to the case concluded that plaintiff retained the residual functional capacity ("RFC") for a range of unskilled, sedentary work.  Plaintiff argues that the ALJ erred in (1) evaluating the credibility of his statements; (2) incorporating his limitations of concentration, persistence, and pace ("CPP") into the RFC; (3) considering the combined effects of his impairments; (4) determining whether his back impairment qualified as conclusively disabling under agency regulations; and (5) accepting testimony from a vocational expert ("VE") regarding jobs he could still do.  Reading the ALJ's decision as a whole, I find no reversible error and thus affirm.

## I.  FACTS AND BACKGROUND

### A.    Plaintiff's Application and Agency Decisions

Plaintiff applied for benefits on February 8, 2017, alleging a disability onset date of November 24, 2016.  (Tr. at 18, 224.)  In his disability report, plaintiff listed numerous medical conditions limiting his ability to work, including knee problems, bad teeth, left shoulder tear/dislocation, arthritis, bipolar disorder, high blood pressure, blood clot disorder, panic attacks, chronic pain, and a sleep disorder.  (Tr. at 253.)  In a function report, plaintiff indicated that his knees were shot, nearly bone on bone, and that he had a hard time sitting or standing.  He also reported pain in both shoulders.  (Tr. at 275.)  He reported no problems with personal care (Tr. at 276), preparing his own meals, and doing

light cleaning and laundry (Tr. at 277). He further reported spending most of his time outdoors and in the woods, hunting, fishing, and wildlife watching. (Tr. at 278-79.) He shopped for food a couple times per month. (Tr. at 278.) He indicated that his impairments limited his ability to lift, squat, bend, stand, reach, walk, sit, kneel, climb stairs, and complete tasks. He could walk a couple blocks. He was easily distracted but followed written and spoken instructions alright. (Tr. at 280.) He indicated he got along with authority figures alright and had never been fired because of problems getting along with others. He reported using a walker and a cane. (Tr. at 281.) In a physical activities addendum, plaintiff reported that he could sit for 20 minutes, stand about 30 minutes, walk 15-20 minutes, and lift 15 pounds. (Tr. at 283.)

The agency sent plaintiff for a consultative mental status examination with Catherine Bard, Psy.D., on June 21, 2017. Asked why he was applying for disability, plaintiff told Dr. Bard that he was awaiting replacement surgery on both knees. He also mentioned a blood clot disorder and dental problems. He further reported a left shoulder surgery that was successful. Regarding his mental history, plaintiff recalled being hospitalized at age 17 after he became violent while he was in jail. He was later diagnosed with bipolar disorder and attention deficit hyperactivity disorder. (Tr. at 698.) He reported that he dropped out of high school when he could no longer play sports due to a shoulder injury, but he later attended a technical college where he obtained his GED and then earned an associate's degree. Regarding his work history, plaintiff reported employment as a chef and kitchen manager at a restaurant/bar for several years. Most recently, he worked at a foundry. (Tr. at 669.)

On mental status exam, Dr. Bard noted that plaintiff entered the room using a cane, casually dressed in clean and tidy clothing.  He was cooperative with no evidence of hostility, a tendency to be overly guarded or defensive or irritable.  He did report mood swings, easily becoming angry with little or no provocation.  (Tr. at 669.)  He reported that his energy level was good, but his ability to stay motivated varied, and his ability to concentrate depended on the task.  He acknowledged that he was frequently restless and irritable.  He did finish most of the things that he started and reported that medication helped stabilize his mood swings.    Dr. Bard found no evidence of delusions, hallucinations, thought disorder, or ongoing psychotic process.    Plaintiff appeared capable of both logical and coherent thinking, and his insight and judgment appeared to be fair.    Regarding memory issues, plaintiff was unable to remember any of three unrelated words after about five minutes, but he was able to recall a series of digits forward and backward on a test of immediate auditory memory skills.  He acknowledged being distracted by traffic noises outside the office.  His fund of knowledge appeared adequate, and he was able to complete serial 7's.  Regarding more abstract levels of thinking, plaintiff could identity relationships among common objects and interpret common proverbs.  (Tr. at 700.)

Asked about his daily routine, plaintiff reported that he liked hunting, fishing, doing thing outdoors, and cooking.  (Tr. at 700.)  He stated that he was able to successfully execute all his basic activities of daily living, and he could do cooking, laundry, grocery shopping, and clean his own area.  (Tr. at 701.)

In a collateral interview, plaintiff's father reported that plaintiff could remember and carry out basic instructions, and his attention and concentration were adequate, as was

his work pace. However, he experienced mood swings, could be quite argumentative with others, and was apt to fall apart emotionally under stress. (Tr. at 701.)

Dr. Bard concluded:

Results of the examination suggest that this individual suffers from Bipolar II Disorder with rapid shifts in mood. In addition, he appears to present with Personality Disorder that has strong features of suspicious thinking and features of Paranoid Personality Disorder. It appears that the primary reason that this individual is seeking help from the Social Security Administration has to do with ongoing medically-based problems. . . . The DDB is encouraged to rely primary upon medically-based information in determining whether this individual can be in the workforce.

(Tr. at 701.)

The agency denied the application initially on July 20, 2017 (Tr. at 106, 152) based on the review of Ronald Shaw, M.D., who found plaintiff capable of sedentary work (Tr. at 87-88), and Soumya Palreddy, who found plaintiff capable of unskilled work despite his "moderate" mental limitations (Tr. at 90). Palreddy found "moderate" limitations in each of the four "paragraph B" criteria of the mental impairment Listings, including CPP. (Tr. at 85.) In her mental RFC assessment, Palreddy found plaintiff moderately limited in the ability to understand and remember detailed instructions, explaining that he performed poorly on memory tests during the mental consultative exam and would do best in a position with simple short instructions. (Tr. at 88.) She found him moderately limited in the ability to carry out detailed instructions; maintain attention and concentration for extended periods; perform within a schedule, maintain regular attendance, and be punctual within customary tolerances; and complete a normal workday without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. She explained that plaintiff was able to follow conversation during the consultative exam and complete serial 7's but

was noted to be distracted by traffic noises outside during the exam. She indicated he would do best in a work situation with simple short instructions with regular breaks. (Tr. at 89.) Palreddy found plaintiff moderately limited in the ability to interact appropriately with the general public, accept instructions and respond appropriately to criticism from supervisors, and maintain socially appropriate behavior. (Tr. at 89.) She explained that plaintiff reported irritability and some history of violence, but he was appropriate with providers and reported social activity. (Tr. at 89-90.) She concluded that he would do best in a position with limited social contact. (Tr. at 90.) Finally, Palreddy found plaintiff moderately limited in the ability to respond appropriately to changes in the work setting, be aware of normal hazards, and set realistic goals/make plans independently of others. She explained that plaintiff reported some history of risky behavior, but he was able to demonstrate abstract thought at the consultative exam. She concluded he "would do best in a position with simple routine tasks with occasional oversight." (Tr. at 90.)

Plaintiff requested reconsideration (Tr. at 158), and the agency sent plaintiff for a consultative medical exam, performed by Dr. A. Neil Johnson on October 5, 2017. Plaintiff reported trouble with both shoulders and both knees. He used a cane, stating he could walk two blocks with or without it. He had been considered for total knee replacement, but it was noted he had poor dentition. He could slowly do stairs with a railing, but it was difficult. He could not climb a ladder or run, and it was hard to squat. He could sit or stand for 20 minutes. He reported knee and shoulder pain but stated his back was good. He reported that he could lift heavy amounts, as much as 300 pounds. (Tr. at 880.) On exam, he walked with an antalgic gait, could not tandem walk, and could squat halfway. He displayed some crepitus of both knees and pain at both knees. He

6

had full range of motion of his shoulders, but there was discomfort.  He had normal use of the hands.  (Tr. at 881.)  He also displayed normal range of motion of the spine (Tr. at 882), 5/5 motor strength, intact sensation, and symmetrical reflexes (Tr. at 883).  Dr. Johnson assessed degenerative arthritis of the knees, moderately severe (Tr. at 883); shoulder pain, with two previous surgeries on the left shoulder, with continued discomfort bilaterally, although he could get them fully overhead; history of multiple kidney stones; venous insufficiency; and bipolar, ADHD (Tr. at 884).

On October 23, 2017 (Tr. at 150, 160), the agency denied reconsideration based on the reviews of Maria Alvarado, Psy.D., who agreed with the previous mental assessment (Tr. at 118, 124-25), and Douglas Chang, M.D., who found plaintiff capable of sedentary work with occasional climbing and postural movements and avoiding concentrated exposure to hazards (Tr. at 120-22).   Plaintiff then requested a hearing before an ALJ.  (Tr. at 165.)

**B.     Hearing**

On February 27, 2019, plaintiff appeared with counsel for his hearing.  Plaintiff's father also testified, and the ALJ summoned a VE to offer testimony on jobs plaintiff might be able to do.  (Tr. at 39.)

**1.     Plaintiff**

Plaintiff testified that he was 42 years old, 5'8" tall, and weighed about 300 pounds.  (Tr. at 47.)  He reported past work as a cook at a bar and restaurant from 2005 to 2010, and as a general laborer/inspector at a casting foundry from 2012 to 2016.  (Tr. at 50-51.)  He lived with his father, who paid the rent and the bills.  He had a driver's license and was

able to drive if it wasn't too far. (Tr. at 48.) After about 20 or 30 minutes he had to stand due to pain and cramping in his legs. (Tr. at 49.)

Plaintiff testified that he underwent left shoulder surgery in February 2017, after which he received some physical therapy. (Tr. at 55.) He indicated that the surgery did not resolve his shoulder pain. (Tr. at 55-56.) He used cream, which reduced the pain but did not eliminate it. He had received no further treatment for his shoulder. (Tr. at 56.) He took a muscle relaxer for his overall pain, in the knees, shoulder, and back. (Tr. at 56.) He indicated that he experienced pain and difficulty reaching out and holding anything heavy. He could not hold anything heavier than a gallon of milk. He testified that he also could not reach fully up all the way. (Tr. at 57.) He reported pain in his right shoulder as well, but he had received no treatment for that (other than the muscle relaxer he took). (Tr. at 58.)

Plaintiff testified that he also experienced difficulties with both knees, receiving injections. (Tr. at 58.) His doctors wanted to perform knee replacements but that had been put off so he could lose weight. (Tr. at 58-59.) He did some physical therapy for his knees. (Tr. at 59.) He also wore knee braces and used a cane. He used the cane to help stabilize and keep him balanced. (Tr. at 60.)

Plaintiff testified that he also had a twisted pelvis and a herniated disc in his back. (Tr. at 61.) He had not received treatment for back pain. To relieve pain, he got into a hot tub or pool to take the pressure off his joints. (Tr. at 62.) His doctors also wanted him to lose weight to take the pressure off his joints and back. (Tr. at 62.)

For his mental health, plaintiff took medication and saw counselors. (Tr. at 62.) He testified that he had violent outbreaks where he got angry easily, had problems being

around people, and experienced panic attacks. (Tr. at 63.) He clarified that his outbursts were verbal, not physical; he denied law enforcement contacts. (Tr. at 63-64.) He testified that he had difficulties with concentration, problems trying to focus on what he was doing, and getting distracted too easily from things going on around him. The medication helped a lot, but he experienced side effects. (Tr. at 64.)

The ALJ asked plaintiff about his ability to handle a seated job with limited interaction with others, and plaintiff testified that after 20 or 30 minutes he would have to stand and move around due to pain. (Tr. at 64-65, 68.) He estimated that he could stand for 20-40 minutes before he had to sit, that he could walk about a block, and that he could lift no more than a gallon of milk. (Tr. at 65.) He reported difficulty getting into the shower, but he could cook and do dishes; his father handled other household chores. He grocery shopped using an electric cart. (Tr. at 66.) He liked to hunt and fish when he could. (Tr. at 67.)

On questioning by his counsel, plaintiff reported taking medications for blood clotting and high blood pressure, which caused dizzy spells. (Tr. at 67-68.) He also wore compression socks to help blood flow in his legs. (Tr. at 69.)

### 2. Plaintiff's Father

Plaintiff's father testified that plaintiff lived with him, and they saw each other every day. (Tr. at 70-71.) He indicated that if plaintiff dropped something on the floor he could not pick it up due to balance problems and inflexibility. (Tr. at 71.) Plaintiff used a cane to walk and did not do well on stairways. (Tr. at 72.)

Plaintiff's father further testified that plaintiff experienced anger outbursts, but the medication had limited that to a point. He tried to ignore some of plaintiff's verbal bursts

and let him get it over with.  (Tr. at 72.)  That did not happen often lately, as the medication balanced him out.  (Tr. at 73.)

    **3.**      **VE**

The VE classified plaintiff's past work in the foundry as a composite job consisting of "grinder," semi-skilled and medium, and "inspector," semi-skilled and light generally but sedentary as performed.  (Tr. at 74.)  She classified the cook job as skilled, medium generally and medium to heavy as plaintiff performed it.  (Tr. at 75.)

The ALJ then asked a hypothetical question, assuming a person of plaintiff's age, education, and work experience, limited to sedentary work with occasional reaching overhead and frequent reaching in other directions; occasional climbing of ramps and stairs; occasional balancing, stooping, kneeling, crouching, and crawling; never working at unprotected heights and no more than occasionally working with moving machinery; further limited to performing simple, routine, and repetitive tasks, making simple work-related decisions, and having no more than frequent interaction with supervisors, occasional interaction with co-workers, and incidental contact with the general public.  (Tr. at 75.)  The VE testified that such a person could not perform plaintiff's past jobs but could do other jobs in the national economy, such as "surveillance system monitor," DOT code 379.367-010, a sedentary, unskilled job with 150,000 positions nationally; "office clerk," DOT code 249.587-018, 95,000 jobs nationally; and "information clerk," DOT code 239.687-014, 45,000 jobs nationally.  (Tr. at 75-76.)  Adding a sit/stand option while remaining on task at the workstation, the answer was the same.  (Tr. at 76.)  Use of a cane for ambulation also did not change the answer.  (Tr. at 76-77.)

The VE testified that employers tolerate an off-task rate of up to 10% and one absence per month.  The VE indicated that the Dictionary of Occupational Titles ("DOT") does not address time off task, absenteeism, sit/stand options, and use of a cane; she used her professional experience and educational background to form her opinion in those areas.  Otherwise, her testimony was consistent with the DOT.  (Tr. at 77.)

Plaintiff's counsel asked about the need for a cane for support or balance, rather than walking to and from the workstation.  (Tr. at 77-78.)  The VE testified that if the use of a cane for support or balance at the workstation impacted productivity, the jobs would be eroded.  (Tr. at 78.)  If the person were limited to occasional reaching bilaterally, the office clerk and information clerk positions would be eliminated, but the surveillance system monitor job would remain in the same number.  (Tr. at 78.)  Counsel did not question the VE regarding her methodology, the source of her job numbers, or the DOT job codes she provided.

## C.    ALJ's Decision

On May 15, 2019, the ALJ issued an unfavorable decision.  (Tr. at 15.)  Following the five-step process set forth in the regulations, see 20 C.F.R. §§ 404.1520(a), 416.920(a), the ALJ determined at step one that plaintiff had not engaged in substantial gainful activity since November 24, 2016, the alleged onset date.  (Tr. at 20.)  At step two, the ALJ found that plaintiff had the severe impairments of degenerative disc disease, degenerative joint disease, obesity, bipolar disorder, anxiety, and personality disorder. (Tr. at 20-21.)

At step three, the ALJ determined that none of these impairments met or equaled the severity of one of the listed impairments.  (Tr. at 21-23.)  Specifically, the ALJ found

Case 1:20-cv-00732-LA   Filed 08/04/21   Page 11 of 45   Document 36

that plaintiff's back impairment did not meet or equal Listing 1.04 "because there is no evidence of nerve root compression with the required characterizations, spinal arachnoiditis, or lumbar spinal stenosis with pseudoclaudication and resulting in an inability to ambulate effectively as defined in listing 1.00B2b." (Tr. at 21.) Pursuant to SSR 02-1p, the ALJ considered plaintiff's obesity as an aggravating factor but concluded that the medical evidence did not indicate that plaintiff's obesity contributed to any other severe impairment causing that impairment to meet or medically equal any relevant Listing. (Tr. at 22.) Finally, the ALJ considered plaintiff's mental impairments under Listings 12.04 (depressive disorders), 12.06 (anxiety disorders), and 12.08 (personality disorders), finding that those impairments caused no more than moderate limitations in the relevant areas of functioning, including CPP. (Tr. at 22.)

At step four, the ALJ found that plaintiff had the RFC to perform a range of sedentary work, with occasional postural movements and overhead reaching, a sit/stand option at will while remaining on task, and the use of a cane for ambulation. Mentally, the ALJ found plaintiff capable of performing simple, routine, and repetitive tasks; making simple work-related decisions; and having frequent contact with supervisors, occasional interaction with co-workers, and incidental interaction with the public. (Tr. at 23.) In reaching this conclusion, the ALJ considered plaintiff's alleged symptoms and limitations, finding plaintiff's statements concerning the intensity, persistence, and limiting effects of his symptoms not entirely consistent with the evidence of record. (Tr. at 24.) The ALJ also considered the medical opinion evidence, giving great weight to the opinions of the agency medical and psychological disability examiners. (Tr. at 28.) Given this RFC, plaintiff could not return to his prior work as a laborer and cook. (Tr. at 29.)

At step five, however, the ALJ determined that plaintiff could perform other jobs as identified by the VE, including surveillance system monitor, office clerk, and information clerk.  (Tr. at 29-30.)  The ALJ accordingly denied the application.  (Tr. at 30-31.)

On March 13, 2020, the Appeals Council denied review (Tr. at 1), making the ALJ's decision the final determination of the Commissioner of Social Security.  See Gedatus v. Saul, 994 F.3d 893, 898 (7th Cir. 2021).  Plaintiff then filed the instant action for judicial review of the ALJ's decision.

## II.  DISCUSSION

### A.    Standard of Review

The court will uphold an ALJ's decision if it uses the correct legal standards, is supported by "substantial evidence," and contains an accurate and logical bridge from the evidence to the conclusions.  Jeske v. Saul, 955 F.3d 583, 587 (7th Cir. 2020).  Substantial evidence is relevant evidence that a reasonable mind could accept as adequate to support a conclusion.  Id.  The court reviews the entire record but may not replace the ALJ's judgment with its own by reconsidering facts, re-weighing or resolving conflicts in the evidence, or deciding questions of credibility.  Id.  Where substantial evidence supports the ALJ's disability determination, the court must affirm the decision even if reasonable minds could differ concerning whether the claimant is disabled.  L.D.R. v. Berryhill, 920 F.3d 1146, 1152 (7th Cir. 2019).

### B.    Citation of Unpublished Decisions

Before getting to the merits, I again address the issue of citing "unpublished" decisions.  In previous cases, plaintiff's counsel accused the Commissioner's lawyers of "sanctionable conduct" by citing such decisions, a contention I rejected.  (R. 31-2 at 4; R.

31-3 at 25.) In the present case, counsel alleges that the Commissioner "failed to warn" the court that a decision was unpublished. (Pl.'s Rep. Br. at 5 n.1.) The Commissioner sought and obtained permission to file a sur-reply addressing this argument. (R. 31.) Plaintiff then filed a reply to the sur-reply (R. 33), which the Commissioner moved to strike (R. 34), prompting plaintiff to file a request to file a response to the sur-reply and motion (R. 35).

Again: citation of unpublished decisions is permitted in this court. No special "warning" is required; the court is able to apprehend that decisions contained in the Federal Appendix are non-precedential. Counsel may, if he wishes, point out that cases relied upon by the Commissioner are unpublished and thus do not bind the court. But the court may consider those decisions for their persuasive value, particularly when they apply settled circuit law to similar facts.

Plaintiff's motion to dismiss the Commissioner's motion for sanctions [sic],[2] the Commissioner's motion to strike, and plaintiff's motion for leave to file a response will all be denied. On to the merits.

## C.  Plaintiff's Arguments

### 1.  Credibility

#### a.  Legal Standards

In considering a claimant's statements regarding his symptoms and limitations, the ALJ must follow a two-step process. First, the ALJ must determine whether the claimant suffers from a medically determinable impairment that could reasonably be expected to produce the alleged symptoms. SSR 16-3p, 2016 SSR LEXIS 4, at *5. Second, if the

---

[2] The Commissioner did not move for sanctions in this case.

14

claimant has such an impairment, the ALJ must evaluate the intensity and persistence of the symptoms to determine the extent to which they limit the claimant's ability to function. Id. at *9. If the statements are not substantiated by objective medical evidence, the ALJ must evaluate the intensity, persistence, and limiting effects of the alleged symptoms based on the entire record and considering a variety of factors, including the claimant's daily activities; factors that precipitate and aggravate the symptoms; the type, dosage, effectiveness, and side effects of any medication the claimant takes; and other treatment the claimant has received for relief of the pain or other symptoms. Id. at *18-19. "The determination or decision must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." Id. at *26. So long as the ALJ gives specific reasons supported by the record, the court will overturn his credibility determination only if it is "patently wrong." Deborah M. v. Saul, 994 F.3d 785, 798 (7th Cir. 2021).

**b.    ALJ's Findings**

The ALJ followed the two-step process in this case (Tr. at 23), finding that while plaintiff's impairments could reasonably be expected to cause the alleged symptoms, plaintiff's statements concerning the intensity, persistence, and limiting effects of those symptoms were "not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." (Tr. at 24.) The ALJ noted that plaintiff alleged disability due to knee and shoulder problems, arthritis in various parts of his body, chronic pain, bipolar disorder, panic attacks, and a sleep disorder. Plaintiff

indicated that he took various medications, which caused side effects including drowsiness and dizziness. (Tr. at 24.)

In a pre-hearing function report, plaintiff alleged pain in the shoulder and knees, and trouble sitting, walking, or standing. Overall, he reported difficulty with lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, climbing stairs, and completing tasks. He reported that he could only walk a couple blocks at a time before needing to rest, and that he used a cane and walker. He further reported pain every day despite medication. Mentally, he reported trouble with concentrating, completing tasks, memory, understanding, following instructions, and getting along with others. (Tr. at 24.)

At the hearing, plaintiff testified that he could sit for 20-30 minutes before needing to stand and stand for 20-40 minutes before needing to sit. He alleged leg cramps and stiffness causing shooting pain. He also alleged continued pain in his left shoulder despite surgery and use of pain cream. He had trouble reaching and lifting anything heavy; he could hold a gallon milk for only a few seconds. He took a muscle relaxer for pain in his knees and back, wore braces on both knees every day, and made use of a cane. He testified that mentally he had violent outbursts and problems being around others. He had poor concentration and got distracted easily. (Tr. at 24.)

The ALJ acknowledged that the record documented plaintiff's history of chronic bilateral knee and shoulder pain, with imaging revealing degenerative changes in the left shoulder, degenerative disc disease of the lumbar spine, and arthritis in the knees. (Tr. at 24.) He received shoulder injections and later underwent left shoulder surgery. (Tr. at 24-25.) He also received medication and chiropractic care. (Tr. at 25.)

Nevertheless, the ALJ concluded that the overall record did not support the extent to which plaintiff alleged he was limited. Regarding his shoulder, the ALJ noted that following his surgery plaintiff reported doing well, with improved range of motion and full strength. He was instructed to follow up as needed, and the record documented no further orthopedic treatment for the left shoulder. (Tr. at 25.)

Plaintiff sought only periodic orthopedic treatment for his knee pain, with instructions to lose weight before undergoing any surgery. Plaintiff reported use of a cane, and his providers prescribed Voltaren gel and injections. While he exhibited reduced range of motion on exam, he was otherwise observed to be in no distress with only mild edema and intact sensation. (Tr. at 25.)

The ALJ indicated that the primary care notes documented that plaintiff was continually observed to be in no distress, suggesting that his pain was not as severe or frequent as alleged. While he did show decreased range of motion, tenderness, and reduced reflexes, at various visits he exhibited only mild edema and no focal neurological deficits. He also showed normal range of motion of the spine with negative straight leg raise testing; even when he did show decreased range of motion of the spine, he still exhibited negative straight leg raise testing, 1+ reflexes, and normal strength. (Tr. at 25.) Similarly, at the October 2017 consultative exam, plaintiff reported knee and shoulder pain and was observed to have an antalgic gait, reduced squat, and reduced range of motion of the knees, but he displayed full range of motion of the shoulders despite pain, normal use of the hands, full range of motion of the spine, 5/5 strength, intact sensation, and symmetrical reflexes. (Tr. at 25-26.)

17

The ALJ further noted that plaintiff's daily activities were not as limited as one would expect given his complaints of disabling symptoms and limitations. For instance, plaintiff reported that he was able to go swimming and ride his bike every day weather permitting. The record also documented that plaintiff was able to hunt, fish, cook, clean, shop, and do things outdoors without any reported difficulty. The ALJ found that this evidence suggested a greater functional ability than alleged. Further, although plaintiff alleged inability to stand or walk for long periods, the record failed to document muscle atrophy or wasting consistent with those allegations, suggesting that plaintiff's inability to perform these activities was not as severe as alleged. (Tr. at 26.)

The record documented that plaintiff sought primary care treatment for mental conditions, reporting symptoms of irritability and insomnia, and receiving medications. However, despite his reported symptoms, plaintiff was alert with only mildly pressured speech and good eye contact. Other treatment visits revealed normal mood, normal affect, and normal behavior. (Tr. at 26.)

In 2018, plaintiff began counseling for his symptoms, and his mental status was generally within normal limits, with plaintiff observed to be cooperative with normal grooming, euthymic mood, normal affect, full orientation, normal memory, and fair to good attention and concentration. He reported that his panic attacks improved with treatment. The ALJ also noted that despite his reports of poor sleep, plaintiff was regularly observed to be alert and oriented, suggesting that his sleep was not as poor as alleged. (Tr. at 26.)

Plaintiff also attended a psychiatric evaluation in connection with his application, reporting a history of bipolar disorder and ADHD with symptoms of mood swings, poor sleep, panic attacks, irritability, and anger. On exam, he was observed to be cooperative

with a clean and tidy appearance.  He demonstrated difficulty with delayed memory recall, but he was able to perform immediate recall and digit forward/backward testing.  He was also able to complete serial calculations and was noted to have a clear sensorium.  (Tr. at 27.)

The ALJ concluded that due to his impairments, including obesity, degenerative disc and joint disease, pain, and reduced range of motion, plaintiff could not sustain the lifting, standing, or walking requirements of light or greater exertional work.  However, the overall evidence, including the lack of distress, improvement with shoulder surgery, generally normal muscle strength, and the extent of his daily activities (e.g., walking two blocks without a cane, cooking, cleaning, swimming, riding a bike, and hunting), suggested that plaintiff was still capable of performing work at the level reflected in the RFC.[3]  (Tr. at 27.)

Importantly, the ALJ did not entirely reject plaintiff's statements.  The ALJ accepted that plaintiff's shoulder pain limited his ability to reach overhead.  His obesity, back and knee impairments, and need for a cane limited his ability to climb, engage in postural movements, and work at unprotected heights or with hazardous machinery.  The ALJ acknowledged plaintiff's alleged use of a cane and a walker, noting that the record failed to document a prescription for a walker, and plaintiff had not been documented to make use of such a device during treatment.  The ALJ thus found that use of a walker was not medically necessary.  The ALJ accommodated plaintiff's difficulties with ambulation by giving him a sit/stand option with the ability to use a cane for ambulation, while noting that

---

[3] The ALJ wrote that plaintiff "is still capable of performing light [sic] work."  (Tr. at 27.) This appears to be a typographical error.

the overall record, including plaintiff's activities, suggested that plaintiff did not need a cane for balance and support, only for ambulation.[4]  (Tr. at 27.)

The ALJ also accommodated plaintiff's mental conditions and related difficulties with irritability, getting along with others, concentrating, and remembering things, finding him incapable of performing complex work with regular interaction with others.  Still, the overall record, including plaintiff's conservative psychiatric treatment history, generally normal mental status findings, and the extent of his daily activities, suggested that plaintiff could perform routine tasks, make simple work-related decisions, and frequently interact with supervisors, occasionally interact with coworkers, and incidentally interact with the public.  (Tr. at 27.)

Finally, the ALJ considered plaintiff's allegations of medication side effects, such as dizziness and drowsiness.  The ALJ noted that the record failed to document such complaints on a consistent basis; indeed, at times plaintiff denied side effects.  (Tr. at 27.) Moreover, plaintiff was often observed to be alert and oriented, suggesting that his subjective complaints were not as severe as alleged.[5]  (Tr. at 28.)

---

[4] Later in his decision, the ALJ gave great weight to the opinions of the agency medical reviewers, Drs. Shaw and Chang, that plaintiff could perform sedentary work with similar limitations.  The ALJ found these opinions generally consistent with the overall record, including plaintiff's lack of distress, improvement with shoulder surgery, generally normal muscle strength, and the extent of his daily activities.  The ALJ found that the record also documented a limitation in reaching due to shoulder pain and the need for a cane.  (Tr. at 28.)  Plaintiff does not challenge the ALJ's evaluation of the opinion evidence.

[5] The ALJ also considered the statements from plaintiff's father, giving them only some weight, noting that the father was not medically trained, was not a disinterested third party, and some of his contentions were unsupported by the record.  (Tr. at 28-29.)  Plaintiff does not challenge this finding.

20

### c.    Analysis

Plaintiff contends that, while the ALJ set out the two-step credibility test, he then merely relied on the condemned "not entirely consistent" template language to complete the assessment.  (Pl.'s Br. at 5, citing Tr. at 24.)  The Seventh Circuit has criticized such templates as "meaningless boilerplate," Parker v. Astrue, 597 F.3d 920, 922 (7th Cir. 2010), but their use is harmless where the ALJ otherwise sets forth the correct legal standards, e.g., Harris v. Saul, 835 Fed. Appx. 881, 886 (7th Cir. 2020), and goes on to provide specific reasons for his conclusion, e.g., Burmester v. Berryhill, 920 F.3d 507, 510 (7th Cir. 2019); Loveless v. Colvin, 810 F.3d 502, 508 (7th Cir. 2016); Pepper v. Colvin, 712 F.3d 351, 367-68 (7th Cir. 2013); see also Lacher v. Saul, 830 Fed. Appx. 476, 478 (7th Cir. 2020) ("[T]he phrase 'not entirely credible' (or 'not entirely consistent') is meaningless only when the ALJ gives no legitimate reasons for discrediting the claimant's testimony.").  As Judge Joseph has noted, in such cases, "Plaintiffs would do better to forgo challenging the boilerplate and instead focus on what the ALJ actually does in the decision." Seibel v. Saul, No. 19-CV-643, 2020 U.S. Dist. LEXIS 63029, at *20 (E.D. Wis. Apr. 8, 2020).

Here, plaintiff ignores virtually everything the ALJ said after the template language. As indicated in section b. above, the ALJ's decision includes a detailed discussion of the evidence, several specific reasons why plaintiff's claims were not fully consistent with the record, and an explanation as to how plaintiff's credible limitations were accommodated in the RFC.

Plaintiff faults the ALJ for failing to lay out all of his primary symptoms, instead providing a cursory summary.  (Pl.'s Br. at 6, 7.)  But an ALJ is permitted to summarize;

he need not discuss every piece of evidence and testimony presented.  See Gedatus, 994 F.3d at 901 (citing Terry v. Astrue, 580 F.3d 471, 475 (7th Cir. 2009)).  In any event, the ALJ's decision here includes three paragraphs detailing plaintiff's allegations from his pre-hearing reports and hearing testimony.  (Tr. at 24 ¶¶ 2-4.)

Plaintiff accuses the ALJ of providing a one-sided view of some of the medical evidence, but he does not identify any evidence the ALJ allegedly ignored or misinterpreted.  (Pl.'s Br. at 6, 7.)  Nor does he acknowledge that the ALJ credited some of his claims, finding him more limited than any medical source opined.  In addition to limiting plaintiff to sedentary work (sitting most of the day) with postural and environmental limitations, as suggested by Dr. Chang, the ALJ added a sit/stand option, overhead reaching limitation, and use of a cane for ambulation.  See Burmester, 920 F.3d at 510 ("This finding was more limiting than that of any state agency doctor or psychologist, illustrating reasoned consideration given to the evidence Burmester presented.").

Plaintiff alleges that the ALJ made no attempt to explain what weight was given to his testimony, reports, and symptoms, and why his corresponding subjective limitations were inconsistent with the medical evidence of record.  (Pl.'s Br. at 6-7.)  An ALJ need not assign particular weight to each specific allegation a claimant makes.  See Shideler v. Astrue, 688 F.3d 306, 312 (7th Cir. 2012) (noting that "an ALJ's credibility findings need not specify which statements were not credible"); Lemerande v. Berryhill, No. 17-C-190, 2018 U.S. Dist. LEXIS 30303, at *10 (E.D. Wis. Feb. 26, 2018) ("An ALJ is not a polygraph machine that assesses each statement individually.  That kind of detail is neither required nor necessary for judicial review.").  Moreover, as indicated above, the ALJ pointed out several inconsistencies between plaintiff's allegations and the other evidence of record;

plaintiff ignores the ALJ's four-page discussion, instead nitpicking at his use of boilerplate language in the introductory portion of the RFC analysis.

Plaintiff's claim that the ALJ made no attempt to provide specific reasons for his conclusion is simply wrong. (Pl.'s Br. at 7; Pl.'s Rep. Br. at 6-7.) For instance, the ALJ contrasted plaintiff's complaints of severe pain with the lack of distress noted by his providers, his complaints of severe shoulder limitations with the documented improvement in this condition following surgery, his claimed weakness with the generally normal muscle strength noted on exams, his claimed need for a cane for balance and support with his reported daily activities such as hunting, and his alleged medication side effects with the lack of documentation in the medical records and his appearance during exams. These reasons track the factors set forth in SSR 16-3p, and plaintiff makes no attempt to claim that they lack the support of substantial evidence. Indeed, he does not even acknowledge that the findings were made.

Plaintiff notes that an ALJ cannot reject a claimant's testimony just because it lacks objective medical support, but he develops no argument that the ALJ violated that rule here. (Pl.'s Br. at 7.) As indicated, the ALJ considered the entire record in reaching his conclusion, not just the objective medical evidence.

In reply, plaintiff contends that the ALJ ignored his symptoms referenced in the medical records and failed to make certain connections between the medical evidence and his alleged symptoms and limitations. (Pl.'s Rep. Br. at 2.) But "ALJs need not comment on every line of every physician's treatment notes." Kolar v. Berryhill, 695 Fed. Appx. 161, 161-62 (7th Cir. 2017). Here, the ALJ provided a detailed summary of plaintiff's

medical treatment, including his reports of pain and limitation. (Tr. at 25-26.) Plaintiff fails to explain how any of the evidence he cites compels additional limitations.

Plaintiff also alleges in reply that the ALJ failed to address his right shoulder problem (Pl.'s Rep. Br. at 2), but the ALJ found that plaintiff's "shoulder pain further limits [him] to positions where he can occasionally reach overhead <u>bilaterally</u> and can perform all other reaching frequently." (Tr. at 27, emphasis added.) Plaintiff does not say what more the ALJ needed to do to accommodate his right shoulder. Plaintiff further alleges that the ALJ overlooked his knee pain and instability (Pl.'s Rep. Br. at 2-3), but the ALJ specifically considered this impairment in finding that plaintiff could not sustain the standing and walking required of light work, and that he was further limited to only occasional climbing of ramps and stairs; occasional kneeling, crouching, and crawling; and needed a cane for ambulation. (Tr. at 27.)

Plaintiff contends that the ALJ also failed to address his concentration problems (Pl.'s Rep. Br. at 3), but the ALJ considered that allegation too, contrasting it with plaintiff's psychiatric treatment history, the generally normal mental status exams, and the extent of his daily activities. Plaintiff notes that a claimant's ability to pay attention in a doctor's office does not mean he can do so at work (Pl.'s Rep. Br. at 3, citing <u>Crump v. Saul</u>, 932 F.3d 567, 571 (7th Cir. 2019)), but the ALJ also relied on plaintiff's extensive daily activities, not just his appearance at medical appointments.

Plaintiff argues that this type of reliance on daily activities is not allowed in the Seventh Circuit (Pl.'s Rep. Br. at 4), but that is incorrect. While the Seventh Circuit has "warned against equating the activities of daily living with those of a full-time job," <u>Hill v. Colvin</u>, 807 F.3d 862, 869 (7th Cir. 2015), "it is entirely permissible to examine all of the

evidence, including a claimant's daily activities, to assess whether 'testimony about the effects of his impairments was credible or exaggerated.'"  Alvarado v. Colvin, 836 F.3d 744, 750 (7th Cir. 2016) (quoting Loveless, 810 F.3d at 508).  In other words, while it would be improper to say, "the claimant can perform this range of activities, therefore he can work," Fifield v. Berryhill, No. 17-C-81, 2017 U.S. Dist. LEXIS 188816, at *53 (E.D. Wis. Nov. 15, 2017) (citing Roddy v. Astrue, 705 F.3d 631, 639 (7th Cir. 2013)), it is entirely appropriate to say, "the claimant can perform this range of activities, therefore he can do more than he claims," id. (citing Pepper, 712 F.3d at 369); see also Densow v. Saul, No 20-2327, 2021 U.S. App. LEXIS 17511, at *10 (7th Cir. June 11, 2021) ("The ALJ, however, did not impermissibly equate those activities to full-time work.  He addressed Densow's activities in the context of assessing whether her symptoms were as limiting as she alleged.") (citing Jeske, 955 F.3d at 592-93).  The ALJ followed the proper course here, contrasting plaintiff's complaints of disabling symptoms and limitations with his activities, which "suggest[ed] a greater functional ability than alleged."  (Tr. at 26.)  The ALJ similarly contrasted those activities with plaintiff's alleged inability to concentrate and remember things.  (Tr. at 27.)

Finally, plaintiff contests in reply the ALJ's reliance on the absence of muscle wasting, noting that unlike the hypothetical claimant mentioned in SSR 16-3p,[6] he did not claim to be limited to walking a few minutes per day.  (Pl.'s Rep. Br. at 5-6.)  But plaintiff

---

[6] "For example, an individual with reduced muscle strength testing who indicates that for the last year pain has limited his or her standing and walking to no more than a few minutes a day would be expected to have some signs of muscle wasting as a result.  If no muscle wasting were present, we might not, depending on the other evidence in the record, find the individual's reduced muscle strength on clinical testing to be consistent with the individual's alleged impairment-related symptoms."  SSR 16-3p, 2016 SSR LEXIS 4, at *12.

<u>did</u> allege significant limitation in his ability to stand and walk, so it is hard to see how the ALJ erred by including this observation in his analysis.

For all of these reasons, I find no reversible error in the ALJ's analysis of plaintiff's statements regarding his symptoms and limitations.

**2.    CPP**

**a.    Legal Standards**

As a general rule, both the hypothetical posed to the VE and the ALJ's RFC assessment must incorporate all of the claimant's limitations supported by the record, including even moderate limitations in concentration, persistence, or pace ("CPP"). <u>E.g.</u>, <u>Yurt v. Colvin</u>, 758 F.3d 850, 857 (7th Cir. 2014). The Seventh Circuit has indicated that the best way to do that is by including the specific limitations—like CPP—in the hypothetical and RFC. <u>E.g.</u>, <u>Crump</u>, 932 F.3d at 570. The court of appeals has further explained that restricting the claimant to unskilled work is generally not enough to account for moderate CPP limitations. <u>Id.</u>  This is so because "observing that a person can perform simple and repetitive tasks says nothing about whether the individual can do so on a sustained basis, including, for example, over the course of a standard eight-hour work shift." <u>Id.</u>

But this does not mean the ALJ is required to use any "magic words" in formulating RFC. <u>E.g.</u>, <u>Lothridge v. Saul</u>, 984 F.3d 1227, 1233 (7th Cir. 2021). In <u>Martin v. Saul</u>, 950 F.3d 369, 374 (7th Cir. 2020), for instance, the court found no reversible error where "the ALJ tailored Martin's RFC to her CPP limitations without assuming that restricting her to unskilled work would account for her mental health impairments." In <u>Jozefyk v. Berryhill</u>, 923 F.3d 492, 498 (7th Cir. 2019), the court affirmed where the claimant's CPP limitations

surfaced only when around other people, and the RFC limited interactions with others. In Pavlicek v. Saul, 994 F.3d 777, 783 (7th Cir. 2021), the court affirmed where a medical source adequately "translated" the moderate CPP limitations into an RFC assessment. Finally, the court of appeals has concluded that CPP errors may be deemed harmless where the claimant fails to identify additional limitations the ALJ should have included. See Pavlicek, 994 F.3d at 784; Jozefyk, 923 F.3d at 498.

### b.    ALJ's Findings

In the present case, at step three, the ALJ found:

> With regard to concentrating, persisting, or maintaining pace, the claimant has a moderate limitation. The claimant has reported having difficulty paying attention, concentrating, and completing tasks. Yet, during treatment, the claimant was noted to have fair to good attention and concentration. At his consultative examination, the claimant was also noted to have a clear sensorium with the ability to complete serial calculations. The claimant is also able to cook, clean, shop, manage funds, go hunting, and go fishing, suggesting no more than moderate limitation in this area.

(Tr. at 22, record citations omitted.)

The ALJ then stated that the "paragraph B" criteria of the mental impairment Listings are not a residual functional capacity assessment, that the mental RFC assessment used at steps four and five requires a more detailed assessment, and that the RFC here reflected the degree of limitation found under the paragraph B analysis. (Tr. at 23.) As indicated above, the mental RFC limited plaintiff to simple, routine, and repetitive tasks; simple work-related decisions; and frequent contact with supervisors, occasional interaction with co-workers, and incidental interaction with the public. (Tr. at 23.)

The ALJ later explained that plaintiff's mental conditions and related difficulties with irritability, getting along with others, concentrating, and remembering things precluded

him from performing complex work with regular interaction with others. However, given his conservative psychiatric treatment history, the generally normal mental status findings, and the extent of his daily activities, the ALJ found that plaintiff could perform routine tasks, make simple work-related decisions, and frequently interact with supervisors, occasionally interact with coworkers, and incidentally interact with the public. (Tr. at 27.)

The ALJ also credited the opinions of the agency psychological reviewers, Drs. Alvarado and Palreddy, that plaintiff had only moderate mental limitations and was capable of performing simple tasks with limited social interaction. The ALJ noted that these opinions came from doctors familiar with social security regulations and were based on a review of the evidence available at the time. The ALJ found the conclusion of only moderate limitations and an ability to perform simple tasks with limited social interaction generally consistent with the overall record, for the reasons stated earlier. However, the ALJ gave little weight to the finding that plaintiff could have only occasional supervision, finding that limitation inconsistent with plaintiff's conservative treatment history, improvement in panic with treatment, and generally normal mental status exams. (Tr. at 28.)[7]

### c.    Analysis

Plaintiff argues that, after the step three determination, the ALJ made no further mention of CPP and appears to have excluded from the RFC any limitations related to the moderate CPP finding. (Pl.'s Br. at 9; Pl.'s Rep. Br. at 8-9.) He contends that the

---

[7] The ALJ gave little weight to the report from Dr. Bard, the consultative psychological examiner, as she deferred to analysis of plaintiff's physical problems. (Tr at 29.)

limitation to simple, routine, and repetitive tasks, if intended to account for his moderate CPP limitation, would be legally insufficient under Crump and like cases. Finally, plaintiff argues that the medical evidence supports additional restrictions given his long history of attention deficit hyperactivity and pain disorder affecting his CPP. (Pl.'s Br. at 9.)

As with his first argument, plaintiff overlooks much of the ALJ's analysis of mental RFC. The ALJ accepted that plaintiff's mental conditions and related difficulties with irritability, getting along with others, concentrating, and remembering things precluded him from performing complex work with regular interaction with others. But the ALJ went on to explain that plaintiff's conservative psychiatric treatment history, generally normal mental status findings, and extensive daily activities suggested that he could perform work involving routine tasks, simple work-related decisions, and limited interaction with others. See Urbanek v. Saul, 796 Fed. Appx. 910, 915 (7th Cir. 2019) ("The record also shows that, despite Urbanek's complaints . . . of difficulties with concentration and fatigue . . . he engaged in many simple routine tasks on a daily basis.").

The ALJ also accepted the opinions of the agency psychological consultants, who opined that plaintiff could handle unskilled work. The consultants explained in the narrative portions of their reports that despite his moderate limitations in the areas of understanding/memory, CPP, and social interaction, plaintiff could manage simple short instructions and limited social contact. (Tr. at 124-25.) The RFC included appropriate limitations, consistent with these findings. See Burmester, 920 F.3d at 511 ("[A]n ALJ may reasonably rely upon the opinion of a medical expert who translates these findings into an RFC determination.").

Plaintiff argues that the exception recognized in Burmester does not apply here (Pl.'s Br. at 10), but he fails to explain why. He contends that, as in Crump, limiting him to simple, routine, and repetitive tasks, with few workplace changes, was not enough. (Pl.'s Br. at 10.) But plaintiff overlooks the complete mental RFC the ALJ adopted in this case, which included limitations to simple work-related decisions and limited interactions with others. As plaintiff himself testified at the hearing, his primary mental difficulties were angry outbursts and problems being around people. (Tr. at 63.) The ALJ's RFC significantly limited plaintiff's interaction with others, particularly coworkers and the public.

Plaintiff contends that the evidence demanded additional restrictions including inability to maintain CPP for a two-hour segment, even in unskilled employment, and that he would be off task over 10% of the workday. (Pl.'s Br. at 10; Pl.'s Rep. Br. at 11.) But plaintiff fails to explain the basis for such limitations. Under agency regulations, a "moderate" limitation means functioning in that area is "fair," which in ordinary usage does not mean bad or inadequate. Pavlicek, 994 F.3d at 783. Thus, the consultants' "moderate" findings provide no basis for concluding that plaintiff is unable to maintain concentration for a two-hour segment. See id. (stating that "a 'moderate' limitation in performing at a consistent pace seems consistent with the ability to perform simple, repetitive tasks at a consistent pace"). Aside from the "moderate" limitations found by the agency psychological consultants, plaintiff cites no evidence that he is unable to maintain attention and concentration for a two-hour segment. Nor does he cite any evidence or medical opinion supporting a 10% time-off-task limitation (or any other specific limitation the ALJ failed to include). See Lockett v. Saul, 834 Fed. Appx. 236, 239 (7th Cir. 2020) ("Lockett cannot show a need for pace-specific restrictions in his residual functional

capacity simply because of the 'moderate' designation; he must have evidence of that need, and he cites none.").

Plaintiff references his history of ADHD and pain disorder, with a long string cite from the record (Pl.'s Rep. Br. at 10), but the ALJ acknowledged these conditions (Tr. at 24, 27), and plaintiff develops no argument that they required the inclusion of specific limitations, such as time-off-task.  See Richards v. Berryhill, 743 Fed. Appx. 26, 30 (7th Cir. 2018) ("[P]ointing to various diagnoses and complaints and saying that they might hinder Richards is insufficient to establish the existence of a functional limitation.").  Thus, even if the ALJ should have more thoroughly explained how he incorporated the CPP limitations into the RFC, any error was harmless.

### 3.    Impairments in Combination

#### a.    Legal Standards

In determining RFC, the ALJ must account for all of the claimant's impairments, even those that are not severe in isolation.  E.g., Murphy v. Colvin, 759 F.3d 811, 820 (7th Cir. 2014); see also Denton v. Astrue, 596 F.3d 419, 423 (7th Cir. 2010) ("When determining a claimant's RFC, the ALJ must consider the combination of all limitations on the ability to work, including those that do not individually rise to the level of a severe impairment.").  This includes any functional limitations resulting from a claimant's obesity. E.g., Pepper, 712 F.3d at 364.  However, failure to specifically discuss obesity may be deemed harmless where the ALJ relies on the opinion of a doctor who considered this impairment, id. at 364-65 (citing Prochaska v. Barnhart, 454 F.3d 731, 736-37 (7th Cir. 2006), or where the claimant fails to specify how his obesity further impairs his ability to work, id. at 365 (citing Skarbek v. Barnhart, 390 F.3d 500, 504 (7th Cir. 2004)).

### b. ALJ's Findings

As indicated above, the ALJ considered plaintiff's statements, the medical records, and the opinion evidence in determining RFC. (Tr. at 23-29.) He specifically explained that plaintiff's obesity, back and knee impairments, and need for a cane limited his ability to climb, engage in postural movements, and work at unprotected heights or with hazardous machinery. (Tr. at 27.) He concluded that the RFC "is supported by the overall record and has been assessed based on all the evidence with consideration of the limitations and restrictions imposed by the combined effects of all the claimant's medically determinable impairments as required by SSR 96-8p." (Tr. at 28.)

### c. Analysis

Plaintiff argues that the ALJ identified his severe impairments in very broad terms, in what results in an attempt to minimize those impairments. (Pl.'s Br. at 10.) For instance, the ALJ found that plaintiff had degenerative disc disease of the lumbar spine, but he did not expound on what that impairment entailed ("spinal stenosis at L3-L4"). (Pl.'s Br. at 11.) Plaintiff contends that the ALJ also should have more graphically described his bilateral knee impairments as "bone on bone" and a "complete collapse" of the medial joint space bilaterally. (Pl.'s Br. at 11.)

"Conditions must not be confused with disabilities. The social security disability benefits program is not concerned with health as such, but rather with ability to engage in full-time gainful employment." Gentle v. Barnhart, 430 F.3d 865, 868 (7th Cir. 2005). Absent some indication that the ALJ's identification of the impairments resulted in the omission of additional work-related limitations from the RFC, any error was harmless. See Castile v. Astrue, 617 F.3d 923, 927 (7th Cir. 2010) (holding that any error at step two

was harmless where the ALJ considered all impairments, severe and non-severe, in determining RFC); <u>Niemer v. Saul</u>, No. 19-CV-627, 2020 U.S. Dist. LEXIS 18773, at *6-7 (E.D. Wis. Fed. 5, 2020) ("So long as the ALJ properly considered all of Niemer's alleged disabling symptoms in formulating the RFC, it matters little which impairment the symptoms stemmed from.").  The ALJ acknowledged plaintiff's use of knee braces and a cane for standing/walking (Tr. at 24), and he limited plaintiff to sedentary work, which is primarily done seated, with a sit/stand option and permitting use of a cane for ambulation (Tr. at 23).  Plaintiff identifies no additional work limitations the ALJ should have included because of his knees or his back.

Plaintiff also faults the ALJ for failing to account for his obesity, but in making this argument he again picks out one snippet from the decision.  (Pl.'s Br. at 11, quoting Tr. at 25: "The undersigned has thus considered any added or cumulative effects the claimant's obesity played on his ability to function.".)  Later in his decision, the ALJ explained that due to the combination of obesity, degenerative disc disease, and degenerative joint disease, plaintiff could not handle the lifting, standing, or walking requirements of light or greater work.  (Tr. at 27.)  The ALJ further explained that the combination of these impairments limited plaintiff's ability to climb, engage in postural movements, and work around heights or hazards.  (Tr. at 27.)  Plaintiff ignores this discussion.

Moreover, plaintiff fails to identify any additional limitations the ALJ should have included due to his obesity.  <u>See</u> <u>Skarbek</u>, 390 F.3d at 504 ("Notably, Skarbek does not specify how his obesity further impaired his ability to work, but speculates merely that his weight makes it more difficult to stand and walk.").  Plaintiff compares his case to <u>Martinez</u>

<u>v. Astrue</u>, 630 F.3d 693, 698-99 (7th Cir. 2011), but in that case the ALJ found that an obese claimant with a bad knee could nevertheless perform a range of light work, which requires a good deal of standing and walking.  <u>See</u> <u>Rider v. Astrue</u>, No. 09-cv-575, 2010 U.S. Dist. LEXIS 45136, at *13 (W.D. Wis. May 7, 2010), <u>rev'd sub nom.</u>, <u>Martinez v. Astrue</u>, 630 F.3d 693 (7th Cir. 2011).  The ALJ limited plaintiff to sedentary work in this case, done primarily in a seated position.

Finally, plaintiff overlooks the ALJ's reliance on the opinions from Dr. Shaw, who specifically considered plaintiff's obesity in concluding that plaintiff could handle sedentary work (Tr. at 88), and Dr. Chang, who also considered plaintiff's obesity in limiting him to sedentary work (Tr. at 120) and in restricting him from working at unprotected heights and operating dangerous machinery (Tr. at 122).  Both doctors noted that plaintiff's BMI exceeded 40 (Tr. at 88, 120), yet they still found him capable of a range of full-time sedentary work.  <u>See</u> <u>Skarbek</u>, 390 F.3d at 504 ("Additionally, the ALJ adopted the limitations suggested by the specialists and reviewing doctors, who were aware of Skarbek's obesity.").  Plaintiff cites no medical opinion suggesting greater limitations.  <u>See</u> <u>Best v. Berryhill</u>, 730 Fed. Appx. 380, 382 (7th Cir. 2018) ("There is no error when there is 'no doctor's opinion contained in the record [that] indicated greater limitations than those found by the ALJ.'") (quoting <u>Rice</u>, 384 F.3d at 382); <u>Sienkiewicz v. Barnhart</u>, 409 F.3d 798, 803 (7th Cir. 2005) (finding no error where both of the consulting physicians who reviewed the claimant's records opined that she could meet the requirements of light work, and no doctor ever suggested that any greater limitation was required).  Plaintiff does not challenge the ALJ's reliance on these opinions.

4.      **Listing**

    a.      **Legal Standards**

At step three of the sequential evaluation process, the ALJ determines whether any of the claimant's impairments qualify as conclusively disabling under the Listings. To meet a Listing, the claimant must present evidence showing that he satisfies each of its "criteria." See Maggard v. Apfel, 167 F.3d 376, 379-80 (7th Cir. 1999). In considering whether a claimant's condition meets or equals a listed impairment, the ALJ must discuss the Listing by name and offer more than a perfunctory analysis. Barnett v. Barnhart, 381 F.3d 664, 668 (7th Cir. 2004). Failure to provide such an analysis may be deemed harmless, however, if the claimant has failed to present evidence showing that he meets the criteria for the Listing. See, e.g., Sosinski v. Saul, 811 Fed. Appx. 380, 381 (7th Cir. 2020) (citing Jeske, 955 F.3d 589-91).

    b.      **ALJ's Findings**

The ALJ found that plaintiff's back impairment did not meet or equal Listing 1.04 "because there is no evidence of nerve root compression with the required characterizations, spinal arachnoiditis, or lumbar spinal stenosis with pseudoclaudication and resulting in an inability to ambulate effectively as defined in listing 1.00B2b." (Tr. at 21.) Pursuant to SSR 02-1p, the ALJ considered plaintiff's obesity as an aggravating factor but concluded that the medical evidence did not demonstrate that plaintiff's obesity contributed to any other severe impairment causing that impairment to meet or medically equal a Listing. (Tr. at 22.)

### c.    Analysis

Plaintiff argues that the ALJ's discussion of Listing 1.04, quoted above, was perfunctory.  Plaintiff contends that the ALJ failed to acknowledge that imaging revealed a spinal bone spur resulting in severe spinal stenosis at L3-L4.  (Pl.'s Br. at 12 & Pl.'s Rep. Br. at 12, citing Tr. at 801, 1062-63, 1070-71.)  He contends the ALJ also overlooked evidence of nerve root compression, including a CT scan indicating the bone spur compressed his spinal cord, leg weakness, positive straight leg raises, sensory loss, hyperactive reflexes, radiating pain, and difficulty ambulating.  (Pl.'s Br. at 13 & Pl.'s Rep. Br. at 12, citing Tr. at 929-30, 932-33, 936, 945, 948, 953, 1168, 1178, 1180, 1185, 1189, 1195.)

Like his previous arguments, plaintiff fails to read the ALJ's decision as a whole in making his Listing claim.  As the Seventh Circuit has noted, "when an ALJ explains how the evidence reveals a claimant's functional capacity, that discussion may doubly explain how the evidence shows the claimant's impairment is not presumptively disabling under the pertinent listing."  Jeske, 955 F.3d at 590.  In this case, the ALJ's RFC discussion "easily supports [his] step-three rejection of [plaintiff's] claim of per se disability under Listing 1.04."  Zellweger v. Saul, 984 F.3d 1251, 1255 (7th Cir. 2021).

Plaintiff does not in his briefs set forth the elements of the Listing.  Rather, he provides a string cite from the record documenting various findings/symptoms, some of which are required by the Listing and some of which are not.  To satisfy Listing 1.04, plaintiff must establish: a disorder of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture); resulting in compromise of a nerve root or the spinal cord; with

evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness); accompanied by sensory or reflex loss; and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine).  20 C.F.R. Part 404, Subpt. P, App. 1, § 1.04 (2021); Zellweger, 984 F.3d at 1254.[8]

The ALJ did not overlook the CT imaging upon which plaintiff relies;[9] indeed, he cited that scan as evidence of plaintiff's severe lumbar spine impairment.  (Tr. at 24, citing Tr. at 1072.)  While the ALJ did not detail the scan's findings ("posterior spur L3-4 results in at least moderate severe central canal stenosis"), he did not have to.  See Woodson v. Astrue, No. 09 CV 8028, 2010 U.S. Dist. LEXIS 88684, at *20 (N.D. Ill. Aug. 27, 2010) ("Although Woodson is correct that an ALJ may not ignore a whole line of evidence that favors the claimant, it is equally true that the ALJ need not mention every detail of the medical record that supports the claimant.") (citing Denton, 596 F.3d at 425).  I see nothing in the CT report specifically contradicting the ALJ's finding of "no evidence of nerve root compression."  See Jeske, 955 F.3d at 591 ("To start, no medical records or other reports mentioned nerve root compression, nor did any of them indicate that all the indicia of nerve root compression were present.").

_____

[8] "New regulations promulgated by the agency in 2021 no longer include Listing 1.04.  But for claims like [plaintiff's] that were filed before April 2, 2021, the listing still applies." Densow, 2021 U.S. App. LEXIS 17511, at *3 n.1.

[9] The record shows that doctors ordered this scan, an abdominal CT, to investigate plaintiff's kidney stones.  (Tr. at 711, 717-19, 801.)  Plaintiff did not at that time actively complain of neuropathy or paresthesias, the radiologist indicated that an MRI could be performed for better characterization, and the treating doctor recommended plaintiff follow up with his primary physician for further evaluation and possible treatment.  (Tr. at 1063.)

37

The ALJ later noted that plaintiff "has also shown normal range of motion in the spine with negative straight leg raise testing (15F/24), and even when [plaintiff] has shown decreased range of motion in the spine, he still exhibited negative straight leg raise testing, 1+ reflexes, and normal strength (15F/5)." (Tr. at 25, citing Tr. at 952, 933.) The ALJ further noted that at various visits for back pain plaintiff displayed tenderness but no other musculoskeletal or neurological deficits. (Tr. at 26, citing 1090-92, 1098-1101, 1121-24.) At other visits plaintiff was noted to have no atrophy, no sensory deficit, and normal muscle tone.[10] (Tr. at 26, citing Tr. at 1106.)

Plaintiff cites an August 2018 note stating: "Unable to assess SLT because pt states he can't recline. Modified SLT in a seated position is positive." (Tr. at 930.)[11] But this single test is plainly insufficient to meet the Listing. See Jeske, 955 F.3d at 591 ("[T]he evidence showed inconsistent straight-leg raising tests—some positive and some negative. And none of the records indicated whether the positive ones were positive in both sitting and supine positions, as Listing 1.04(A) requires."). Plaintiff also cites a July 2018 note documenting "trace" reflexes. (Tr. at 933.) But plaintiff fails to explain why this single note satisfies the requirement of "sensory or reflex loss," particularly given the evidence of no sensory or neurological deficits cited by the ALJ. And none of the records plaintiff cites document motor loss. In sum, plaintiff failed to produce evidence that he met every element of the Listing, as it was his burden to do. See Hall v. Berryhill, 906 F.3d 640, 645 (7th Cir. 2018).

---

[10] The medical records indicate that plaintiff used a cane due to his knee arthritis and obesity, not because of his back impairment. (See Tr. at 669.)

[11] The ALJ twice referenced this note (Tr. at 25, citing 15F/2 [930]; Tr. at 26, citing 15F/1 [929]), although he did not discuss the straight leg raise testing conducted at this visit.

38

Finally, the ALJ gave great weight to the opinions of the agency medical consultants, who concluded that plaintiff did not meet or equal a Listing. Plaintiff presented no medical opinion to the contrary. See Filus v. Astrue, 694 F.3d 863, 867 (7th Cor. 2012) ("[Filus] disregards the opinions from the two state-agency physicians who concluded that he did not meet or medically equal any listed impairment. Because no other physician contradicted these two opinions, the ALJ did not err in accepting them."). In reply, plaintiff contends that the state agency failed to discover the July 2017 CT scan, then argues that the ALJ's failure to submit these imaging results to medical scrutiny also requires remand. (Pl.'s Rep. Br. at 12.) Plaintiff is wrong. Dr. Chang considered this evidence at the reconsideration level. (Tr. at 116, 123.) There is accordingly no basis for remand to reconsider the Listings or the July 2017 imaging evidence.

## 5. VE's Testimony

### a. Legal Standards

At step five of the sequential evaluation process, the burden shifts to the Commissioner to establish that the claimant can perform other work that exists in significant numbers in the national economy. To this end, the ALJ may rely on either the Medical-Vocational Guidelines ("the Grids"), a chart that classifies a claimant as disabled or not disabled based on age, education, and exertional ability, or obtain testimony from a VE on jobs the claimant can still do. If the claimant cannot perform the full range of work at a particular exertional level, use of the Grids is inappropriate and the ALJ must consult a VE. See Fast v. Barnhart, 397 F.3d 468, 470 (7th Cir. 2005).

The ALJ may accept the testimony of a VE in making a step-five determination, so long as that testimony is reliable. Overman v. Astrue, 546 F.3d 456, 464 (7th Cir. 2008).

The ALJ is required to ask about conflicts between VE testimony and job information in the DOT.  SSR 00-04p, 2000 SSR LEXIS 8, at *9.  The Seventh Circuit has held that, where no one questions the VE's foundation or reasoning at the hearing, the ALJ is generally entitled to accept her conclusions.  See Donahue v. Barnhart, 279 F.3d 441, 446 (7th Cir. 2002); see also Surprise v. Saul, 968 F.3d 658, 662 (7th Cir. 2020) (explaining that an ALJ may accept a VE's uncontradicted testimony absent obvious internal conflicts).

### b.    ALJ's Findings

The ALJ noted that, if plaintiff had the capacity for a full range of sedentary work, the Grids would direct a finding of not disabled.  However, given the existence of additional limitations, the ALJ turned to a VE to determine the extent to which these limitations eroded the unskilled sedentary occupational base.  (Tr. at 30.)

The VE testified that a person with plaintiff's characteristics could perform the requirements of representative occupations such as surveillance system monitor, with 150,000 national jobs; office clerk, with 95,000 national jobs; and information clerk, with 45,000 national jobs.  (Tr. at 30.)  Pursuant to SSR 00-04p, the ALJ determined that the VE's testimony was consistent with the DOT.  The ALJ accepted the VE's explanation that any testimony on topics not addressed by the DOT was based on her professional experience and education.  (Tr. at 30.)  As indicated above, plaintiff's counsel did not at the hearing question the VE's job numbers or the DOT codes she provided.

c.    **Analysis**

i.    **Three Jobs Identified by the VE**

Plaintiff now raises issues with all three jobs identified by the VE.  He first argues that the surveillance system monitor ("SSM") position no longer exists as described in the DOT.[12]  (Pl.'s Br. at 13.)  He indicates that the DOT describes this as a government job performed in public transportation terminals, which has changed significantly since the DOT was last updated.  (Pl.'s Br. at 14.)  He states that the position is now called "gaming surveillance officer" and is semi-skilled to skilled, beyond his RFC.  (Pl.'s Br. at 15.)  He indicates that the Seventh Circuit has not addressed the unreliability of the DOT, but other circuits have indicated that the DOT is almost obsolete and the "O*NET" should be referenced to ensure up-to-date job descriptions are available.  (Pl.'s Br. at 15, citing Cunningham v. Astrue, 360 Fed. Appx. 606 (6th Cir. 2010).)  Finally, plaintiff cites an article in the Journal of Forensic Vocational Analysis suggesting that the SSM position no longer exists in the national economy as an unskilled occupation.  (Pl.'s Br. at 16; Pl.'s Rep. Br. at 13-14.)

The Seventh Circuit has noted that the DOT is outdated, see, e.g., Chavez v. Berryhill, 895 F.3d 962, 965 (7th Cir. 2018), and suggested in dicta that it has been superseded by the O*NET, see, e.g., Alaura v. Colvin, 797 F.3d 503, 507 (7th Cir. 2015).  However, the Seventh Circuit has not reversed based on DOT obsolescence alone, the Social Security Administration specifically declined to adopt the O*NET, and courts have

_____

[12] Plaintiff also contends that under SSR 00-4p the DOT's description of occupations is controlling over a VE's opinion.  (Pl.'s Br. at 14.)  The Seventh Circuit has held that "the ALJ must be entitled to accept testimony of a vocational expert whose experience and knowledge in a given situation exceeds that of the Dictionary's authors."  Donahue, 279 F.3d at 446.

41

rejected the notion that an ALJ must sua sponte check for conflicts with the O*NET.  See

Ragland v. Berryhill, No. 17-C-0730, 2018 U.S. Dist. LEXIS 61864, at *33-35 (E.D. Wis.

Apr. 12, 2018) (collecting cases).  Moreover, the Sixth Circuit has since backed away

from any suggestion that Cunningham requires rejection of the DOT:

> Recognizing the apparent confusion among some of the lower courts about
> whether the DOT continues to be a reliable source of information at step
> five, we clarify that the DOT data can establish the existence of jobs in the
> national economy in significant numbers.  Although the court remanded to
> the ALJ in Cunningham for further consideration at step five, the panel did
> not conclude categorically that the DOT was an obsolete and unreliable
> source of job information.  The current regulation governing this inquiry lists
> the DOT as a source of reliable job information.   The regulation does not
> list O*NET as a reliable source.  And, in fact, in 2010, the SSA determined
> that O*NET in its current form was not suitable for disability claims
> adjudication.
>
> What is more, in Kyle, published after Cunningham, we reiterated that the
> ALJ can rely on the DOT to establish that work exists in the national
> economy.  609 F.3d at 855.  We follow Kyle here.  And we note that no
> binding post-Cunningham decision from this court has remanded to the
> Commissioner based on a vocational expert's reliance on the DOT.

O'Neal v. Comm'r of Soc. Sec., 799 Fed. App. 313, 317 (6th Cir. 2020) (internal citations

omitted).  Plaintiff fails to establish error based solely on reliance on the DOT.

But there is a more fundamental problem with plaintiff's argument: his counsel did

not, at the hearing, raise the issue.  Counsel could have questioned the VE about the

duties of the SSM position as it currently exists and, depending on the response, argued

to the ALJ that those duties exceed plaintiff's capacity.  He also could have submitted to

the ALJ the article upon which plaintiff now so heavily relies.  (Pl.'s Rep. Br. at 13.)  Having

failed to do so, "the VE's testimony was both unobjected to and uncontradicted.  Thus,

the ALJ was entitled to credit this testimony."  Liskowitz v. Astrue, 559 F.3d 736, 744 (7th

Cir. 2009); see also Coyier v. Saul, No. 20-1899, 2021 U.S. App. LEXIS 15928, at *5 (7th

Cir. May 27, 2021) (holding that, by failing to object, the claimant effectively conceded the reliability of the VE's numbers); Eads v. Sec'y of Health & Human Servs., 983 F.2d 815, 817 (7th Cir. 1993) ("The correctness of [the ALJ's] decision depends on the evidence that was before him. He cannot be faulted for having failed to weigh evidence never presented to him[.]") (internal citations omitted).

Plaintiff notes that the DOT code provided by the VE for the office clerk position actually corresponds to "document preparer, microfilming," and the code for the information clerk position actually refers to the job of "tube operator." He contends the VE's testimony was therefore unreliable. (Pl.'s Br. at 16-17.) Any error in accepting the VE's testimony regarding these jobs was harmless based on the VE's identification of a significant number of SSM jobs: 150,000 in the national economy. See Weatherbee v. Astrue, 649 F.3d 565, 572 (7th Cir. 2011) (finding 140,000 jobs available nationally "well above the threshold for significance"); Tolley v. Astrue, No. 09-2019, 2010 U.S. Dist. LEXIS 71958, at *16 (C.D. Ill. July 15, 2010) (finding any error regarding three jobs harmless where the VE identified a fourth existing in significant numbers). Plaintiff does not argue otherwise in reply. (See Pl.'s Rep. Br. at 14.)

### ii. Local Job Numbers

Plaintiff also argues that the ALJ erred by accepting the VE's provision of national job numbers. (Pl.'s Br. at 17.) He relies on dicta in Browning v. Colvin, in which the court stated:

> There is still another problem with the decision to deny the plaintiff benefits, more precisely perhaps an omission, remarked on by neither party. The plaintiff lives with her mother in a small town in southwestern Indiana, population 3500, named Chandler. There is bus service to Evansville, however, a city whose metropolitan has a population of more than 300,000. The vocational expert calculated that the plaintiff's residual functional

capacity would enable her to perform such jobs as hand packer, production helper, and miscellaneous laborer, and that there are 127 such jobs in the Chandler "area," in which the vocational expert presumably meant to include Evansville. For she testified that there are only 1683 such jobs in all of Indiana, a state with a population of more than six and a half million. We can't imagine the plaintiff's being able to live by herself; she's stuck in Chandler. There are of course a much larger number of such jobs in the American economy as a whole (about 350,000 according to the vocational expert). But if as seems to be the case the plaintiff is incapable, by reason of her mental and physical condition, of seeking work outside the Chandler area, it is hard to see the relevance of job opportunities elsewhere in the United States. Needless to say there is no information on how many of the 127 jobs in the Chandler area are likely to be vacant, and how many of those jobs are ones the plaintiff could do. Obviously many (we imagine most) production helpers and miscellaneous laborers are not sedentary workers, leaving the hand packers (more about hand packing below).

It's true that a regulation of the Social Security Administration states that "we consider that work exists in the national economy when it exists in significant numbers either in the region where you live or in several other regions of the country. It does not matter whether . . . work exists in the immediate area in which you live." 20 C.F.R. § 404.1566. The reason the vocational expert is required to estimate the number of jobs the claimant can do that exist in the local, regional, and national economy is that, as the regulation indicates, if there is a large number of such jobs in any of the three areas ("region" presumably encompassing both a local area and the entire state), the claimant loses. The peculiarity of this case is that it is the claimant's disability that makes the number of jobs in the region or the nation irrelevant, because it prevents her from moving. That immobility is a consequence of the disability, and so needs to be factored into the analysis of job availability.

766 F.3d 702, 708 (7th Cir. 2014). Plaintiff contends that, like the claimant in Browning, he is stuck living with his father in a small town in Wisconsin. Thus, the VE should have provided job numbers in the Wild Rose, Wisconsin area, rather than national numbers. (Pl.'s Br. at 17-18.)

Plaintiff forfeited this argument by failing to object to the provision of national numbers at the hearing. See Brown v. Colvin, 845 F.3d 247, 254 (7th Cir. 2016) ("Brown . . . forfeited her argument regarding the vocational expert's testimony about the number

of positions for each of the six jobs by failing to object during the hearing.").  Had plaintiff raised the issue at the hearing, the VE may have been able to provide local or regional numbers.

In any event, plaintiff's situation is nothing like that of the claimant in Browning, an intellectually disabled young woman with an IQ of 68, who could not read beyond a kindergarten level; could not use a computer or obtain a driver's license; lived at home with her mother; and whose entire work history consisted of three days of part-time janitorial work.  Plaintiff, by contrast, is not cognitively impaired, is able to drive and care for himself, and has a multi-year history of employment at various locations; it appears that he lives with his father due to financial constraints.  Accordingly, I am "not persuaded that immobility is a consequence of Plaintiff's conditions, and therefore the general rule regarding national job statistics applies here.  The VE's testimony is not unreliable simply because it included national, as opposed to local, numbers."  Krug v. Saul, 466 F. Supp. 3d 942, 956 (E.D. Wis. 2020), aff'd, 846 Fed. Appx. 403 (7th Cir. 2021).

### III.  CONCLUSION

**THEREFORE, IT IS ORDERED** that the ALJ's decision is affirmed, and this case is dismissed.  The clerk is directed to enter judgment accordingly.

**IT IS FURTHER ORDERED** that plaintiff's motion to dismiss defendant's motion (R. 33), the Commissioner's motion to strike (R. 34), and plaintiff's motion for leave to file (R. 35) are denied.

Dated at Milwaukee, Wisconsin this 4th day of August, 2021.

/s/ Lynn Adelman
LYNN ADELMAN
District Judge